O

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

RYAN DOUGLAS CASNER,        ) Case No. CV 12-7981-JPR
                            )
              Plaintiff,  )
                            ) MEMORANDUM OPINION AND ORDER
          vs.          ) AFFIRMING THE COMMISSIONER
                            )
CAROLYN W. COLVIN,         )
Acting Commissioner of    )
Social Security,[1]       )
                            )
            Defendant.  )
                            )

## I.  PROCEEDINGS

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security Supplemental Security Income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c).  This matter is before the Court on the parties' Joint Stipulation, filed June 12, 2013, which the Court has taken under submission without oral argument.  For the

---

[1]     On February 14, 2013, Colvin became the Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25(d), the Court therefore substitutes Colvin for Michael J. Astrue as the proper Respondent.

1

reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

**II.   BACKGROUND**

    Plaintiff was born on March 30, 1961. (Administrative Record ("AR") 47, 190.)  He finished the 11th grade but did not graduate high school.  (AR 47, 293.)  He previously worked as a shipper and receiver, mechanic, and general laborer but had apparently not worked since 1998.  (AR 47-48, 212, 217.)

    On October 31, 2002, Plaintiff filed an application for SSI (AR 66), apparently alleging that he was unable to work because of psoriasis, back pain, alcohol abuse, and vision problems (AR 68, 70).  His application was denied initially and upon reconsideration.  (AR 66.)  After his application was denied, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (Id.)  A hearing was held on August 5, 2004; Plaintiff failed to appear, but his presence was deemed nonessential. (Id.)  In a written decision issued January 28, 2005, the ALJ determined that Plaintiff was not disabled.  (AR 66-71.) Plaintiff apparently did not appeal that decision to the U.S. District Court, and it therefore became final and binding.  See 20 C.F.R. § 416.1481; Taylor v. Heckler, 765 F.2d 872, 875 (9th Cir. 1985).

    On October 16, 2008, Plaintiff filed a new application for SSI, alleging that he had been unable to work since December 31, 1998,[2] because of depression, anxiety, psoriasis, and vision

_____

    [2]    SSI payments are not made retroactively but "are prorated for the first month for which eligibility is established after application and after a period of ineligibility."  SSR 83-

impairment.  (AR 32, 211.)  His new application was denied

initially, on January 29, 2009 (AR 32, 78-81), and upon

reconsideration, on May 29 (AR 32, 85-89).  Plaintiff again

requested a hearing before an ALJ.  (AR 93-94.)  A hearing was

held on June 8, 2010, at which Plaintiff again failed to appear.

(AR 62, 146.)  After submitting a good-cause statement explaining

the reasons for his nonappearance (AR 151), Plaintiff was granted

a second hearing, which took place on October 12, 2010 (AR 153).

At the hearing, Plaintiff appeared with counsel and testified on

his own behalf (AR 44-54); a vocational expert ("VE") also

testified (AR 55-58).  In a written decision issued November 5,

2010, the ALJ determined that Plaintiff was not disabled.  (AR

32-39.)  On June 14, 2012, the Appeals Council denied Plaintiff's

request for review.  (AR 7-9.)  This action followed.

## III. STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), a district court may review

the Commissioner's decision to deny benefits.  The ALJ's findings

and decision should be upheld if they are free of legal error and

supported by substantial evidence based on the record as a whole.

Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420,

1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746

(9th Cir. 2007).  Substantial evidence means such evidence as a

---

20, 1983 WL 31249 (Jan. 1, 1983).  For this reason, at the
October 2010 hearing, Plaintiff amended his disability-onset date
to October 16, 2008, the day he filed the instant application for
SSI benefits.  (AR 47.)  In his decision, the ALJ sometimes
analyzed Plaintiff's impairments from his original onset date of
December 31, 1998.  (AR 36.)  To the extent the ALJ erred,
however, any error was harmless because, among other reasons,
Plaintiff's medical records dated back only to October 2008.

reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla but less than a preponderance.  Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)).  To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner.  Id. at 720-21.  "The principles of res judicata apply to administrative decisions, although the doctrine is applied less rigidly to administrative proceedings than to judicial proceedings." Chavez v. Bowen, 844 F.2d 691, 693 (9th Cir. 1988.)  "Normally, an ALJ's findings that a claimant is not disabled 'creates a presumption that the claimant continued to be able to work after that date.'"  Vasquez v. Astrue, 572 F.3d 586, 597 (9th Cir. 2009) (quoting Lester v. Chater, 81 F.3d 821, 827 (9th Cir. 1995) (as amended Apr. 9, 1996)).  "The presumption does not apply, however, if there are 'changed circumstances.'" Lester, 81 F.3d at 827 (quoting Taylor, 765 F.2d at 875); accord Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3.  One example of a changed circumstance is "where the claimant raises a new issue, such as the existence of an impairment not considered in the previous application." Lester, 81 F.3d at 827 (citing Gregory v. Bowen, 844 F.2d 664, 666 (9th Cir. 1988)).

4

**IV.   THE EVALUATION OF DISABILITY**

People are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.   42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

A.   <u>The Five-Step Evaluation Process</u>

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.   20 C.F.R. § 416.920(a)(4); <u>Lester</u>, 81 F.3d at 828 n.5.   In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied.   § 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied.   § 416.920(a)(4)(ii).   If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. § 416.920(a)(4)(iii).   If the claimant's impairment or

5

1  combination of impairments does not meet or equal an impairment
2  in the Listing, the fourth step requires the Commissioner to
3  determine whether the claimant has sufficient residual functional
4  capacity ("RFC")[3] to perform his past work; if so, the claimant
5  is not disabled and the claim must be denied.
6  § 416.920(a)(4)(iv).  The claimant has the burden of proving that
7  he is unable to perform past relevant work.  Drouin, 966 F.2d at
8  1257.  If the claimant meets that burden, a prima facie case of
9  disability is established.  Id.  If that happens or if the
10 claimant has no past relevant work, the Commissioner then bears
11 the burden of establishing that the claimant is not disabled
12 because he can perform other substantial gainful work available
13 in the national economy.  § 416.920(a)(4)(v).  That determination
14 comprises the fifth and final step in the sequential analysis.
15 § 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

16         B.   The ALJ's Application of the Five-Step Process

17       At step one, the ALJ found that Plaintiff had not engaged in
18 any substantial gainful activity since October 16, 2008.  (AR
19 34.)  At step two, the ALJ concluded that Plaintiff had the
20 severe impairments of vision problems, psoriasis, anxiety, and
21 depression.  (Id.)  At step three, the ALJ determined that
22 Plaintiff's impairments did not meet or equal any of the
23 impairments in the Listing.  (Id.)  At step four, the ALJ found
24
25
26

27       [3]    RFC is what a claimant can do despite existing
28 exertional and nonexertional limitations.  20 C.F.R. § 416.945;
   see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

that Plaintiff retained the RFC to perform heavy work,[4] subject
to certain "mild" limitations:

> understanding and remembering tasks; sustained
> concentration and persistence; socially interacting with
> general public; and adapting to workplace changes.
> Furthermore, the claimant should avoid outdoor activities
> in the sun due to psoriasis.

(AR 34.)  The ALJ further concluded that because of Plaintiff's
depression, history of drug abuse, and lack of work history, he
should be "restrict[ed] to entry-level work that is with things
rather than people."  (AR 35.)  Based on the VE's testimony, the
ALJ concluded that Plaintiff was "capable of making a successful
adjustment to . . . work that exists in significant numbers in
the national economy."  (AR 39.)  Accordingly, the ALJ determined
that Plaintiff was not disabled.  (Id.)

**V.  DISCUSSION**

Plaintiff alleges that the ALJ erred in rejecting the
opinion of his treating "psychiatrist," Ms. Meena Gupta.  (J.
Stip. at 4.)  Plaintiff subsequently concedes that Ms. Gupta was
in fact not a psychiatrist but a licensed clinical social worker.
(J. Stip. at 9.)  The ALJ mistakenly referred to Ms. Gupta as
"Dr. Gupta" when he summarized her mental-impairment
questionnaire, completed November 2, 2009.  (AR 37, 331-34.)

---

[4]     "Heavy work" involves "lifting no more than 100 pounds
at a time with frequent lifting or carrying of objects weighing
up to 50 pounds."  20 C.F.R. § 416.967(d).  The regulations
further specify that "[i]f someone can do heavy work, we
determine that he or she can also do medium, light, and sedentary
work," as defined in § 416.967(a)-(c).  Id.

7

A.   <u>The ALJ Did Not Err in Rejecting Ms. Gupta's Opinion</u>

Plaintiff contends that the ALJ failed to set forth legally sufficient reasons for rejecting the opinions of Ms. Gupta. (J. Stip. at 4.)  Remand is not warranted on that basis, however, because Ms. Gupta was not an "acceptable medical source" and her opinion was not entitled to special weight.  In any event, the ALJ provided legally sufficient reasons for according little weight to her opinion.

1.   <u>Applicable law</u>

Three types of physicians may offer opinions in Social Security cases: (1) those who directly treated the plaintiff (treating physicians), (2) those who examined but did not treat the plaintiff (examining physicians), and (3) those who did not directly treat or examine the plaintiff (nonexamining physicians).  <u>Lester</u>, 81 F.3d at 830.  A treating physician's opinion is generally entitled to more weight than that of an examining physician, and an examining physician's opinion is generally entitled to more weight than that of a nonexamining physician.  <u>Id.</u>

The opinions of treating physicians are generally afforded more weight than the opinions of nontreating physicians because treating physicians are employed to cure and have a greater opportunity to know and observe the claimant.  <u>Smolen v. Chater</u>, 80 F.3d 1273, 1285 (9th Cir. 1996).  If a treating physician's opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record, it should be given controlling weight.  20 C.F.R. § 416.927(c)(2).

The ALJ "need not accept the opinion of any physician, including a treating physician, if that opinion is brief, conclusory, and inadequately supported by clinical findings." Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (ALJ may reject check-off reports that do not contain an explanation of basis for conclusions); Murray v. Heckler, 722 F.2d 499, 501 (9th Cir. 1983) (expressing preference for individualized medical opinions over check-off reports). Because 20 C.F.R. § 416.927 contains guidelines for weighing opinions from "acceptable medical sources" but none for weighing "other sources," an ALJ may accord opinions from "other sources" less weight. Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996), superseded by regulation on other grounds as noted in Hudson v. Astrue, No. CV-11-0025-CI, 2012 WL 5328786, at *4 n.4 (E.D. Wash. Oct. 29, 2012).

In determining disability, the ALJ "must develop the record and interpret the medical evidence." Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003). Nonetheless, it remains the plaintiff's burden to produce evidence in support of his disability claims. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001). Moreover, the ALJ's duty to develop the record is triggered only when there is "ambiguous evidence or when the record is insufficient to allow for proper evaluation of the evidence." Id. at 459-60. When the evidence received from a treating physician is inadequate to allow the ALJ to determine the claimant's disability, the ALJ has a duty to recontact the

1  physician.  See Brinegar v. Astrue, 337 F. App'x 711, 712 (9th

2  Cir. 2009).

3      2.  Relevant facts

4      Plaintiff's medical evidence of record begins on October

5  24, 2008, shortly after he was released from prison.  (AR 289.)

6  Heidi George, a social worker, noted that Plaintiff was

7  depressed.  (Id.)  He stated that he "[had] never had this big of

8  a hole in [his] life."  (Id.)  Plaintiff described "'butterflies

9  in [his] stomach,'" anxiety, and decreased appetite.  (Id.)  He

10 "acknowledge[d] auditory hallucinations since the age [of] 10"

11 but stated that he had never received mental-health treatment

12 before Spring 2008.  (Id.)  He denied having any previous or

13 current suicidal intention and had normal sleep patterns.  (Id.)

14 He had been prescribed risperidone, Remeron, oxcarbazepine, and

15 diphenhydramine[5] and had apparently been taking this regimen for

16 about two months but did not feel that it was particularly

17 helpful.  (Id.)  He reported still hearing voices and feeling

18 depressed.  (Id.)  Four days later, on October 28, 2008, Ms.

19 George again evaluated Plaintiff.  (AR 293.)  She noted that he

20

21      [5]   Risperidone is an antipsychotic medication used to
   treat symptoms of schizophrenia and bipolar disorder.
22 Risperidone, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
   druginfo/meds/a694015.html (last updated July 25, 2013).  Remeron
23 is an antidepressant used to treat depression.  Mirtazapine,
   MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/
24 a697009.html (last updated July 25, 2013).  Oxcarbazepine is an
   anticonvulsant sometimes used to treat bipolar disorder.
25 Oxcarbazepine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
   druginfo/meds/a601245.html (last updated July 25, 2003).
26 Diphenhydramine is an antihistamine sometimes used to treat
   insomnia.  Diphenhydramine, MedlinePlus, http://www.nlm.nih.gov/
27 medlineplus/druginfo/meds/a682539.html (last updated July 25,
   2013).
28

had first consulted a psychiatrist in April 2008 because of depression and hearing voices. (Id.) Even though Plaintiff had been "prescribed a variety of medications while in custody" and Ms. George had stated four days earlier that he was taking a four-drug regimen, she noted that he was taking only Remeron. (Id.) Plaintiff stated that he had started using alcohol and marijuana at age 10 and began using methamphetamine at around age 35. (Id.) He reported having abstained from drugs for three years after completing a three-month drug program but had recently used methamphetamine again. (Id.)

On November 6, 2008, Dr. Steven Horwitz, a psychiatrist, evaluated Plaintiff, noting that he had a "dirty [drug] test" and was "[g]oing to a [drug] program in Long Beach." (AR 288.) Plaintiff apparently could not recall any of his medications and voiced concerns about their side effects. (Id.) Plaintiff signed a consent form to restart Remeron. (Id.)

On December 8, 2008, Plaintiff was examined by Dr. Seehraj S. Inderjit, a psychiatrist. (AR 287.) Dr. Inderjit noted that Plaintiff reported hearing voices at night and getting frustrated easily, with rapid mood changes and difficulty sleeping. (Id.) Plaintiff reported that he had taken Risperdal and Trileptal[6] in prison with good results but that he disliked taking "too many pills." (Id.) Dr. Inderjit's mental exam revealed that Plaintiff was "[alert and oriented] x 3," clean, and cooperative.

---

[6]    Risperdal is a brand-name version of risperidone. Risperidone, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a694015.html (last updated July 25, 2013). Trileptal is a brand-name version of oxcarbazepine. Oxcarbazepine, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a601245.html (last updated July 25, 2013).

(Id.)  He exhibited fair eye contact, spontaneous speech,
euthymic mood, and appropriate affect, with no psychomotor
agitation or retardation and no recent suicidal or homicidal
ideation.  (Id.)  Dr. Inderjit prescribed Remeron and
risperidone.  (AR 291.)

On January 3, 2009, Plaintiff was examined by
ophthalmologist Dr. David Paikal, who noted that Plaintiff
exhibited "a large angle esotropia" but no other unusual
pathological findings.  (AR 294.)  Plaintiff exhibited "counting
fingers"[7] vision, both with and without correction and from a
distance and at close range.  (Id.)  Dr. Paikal diagnosed
Plaintiff with strabismus[8] but found Plaintiff's alleged level of
vision inconsistent with his degree of pathology, stating, "I
find unlikely this patient have counting fingers vision in both
eyes."  (Id.)  He also noted that "[Plaintiff] was able to enter
the exam room and to sit in the exam chair unassisted."  (Id.)

On January 13, 2009, Dr. Charlene K. Krieg, a clinical
psychologist, performed a consultative psychological evaluation
of Plaintiff.  (AR 297-302.)  Plaintiff reported being unable to
fill out a written questionnaire because of poor vision and
stated that he needed glasses for reading.  (AR 297.)  Although

---

[7]  "Counting fingers" is a qualitative ophthalmological
term meaning that the patient has very limited vision that cannot
be quantified with the use of an eye chart.  See Williams v.
Astrue, No. CV-08-3075-CI, 2009 WL 3422788, at *12 (E.D. Wash.
Oct. 22, 2009).

[8]  Strabismus is a disorder in which the two eyes do not
properly line up to focus on the same object.  Strabismus,
MedlinePlus, http://www.nlm.nih.gov/medlineplus/ency/article/
001004.htm (last updated Mar. 22, 2013).

he arrived at the appointment by taxi (AR 297), he denied knowing his address or phone number (AR 299).  Dr. Krieg noted, "He was moderately to minimally cooperative and may not have been putting forth his best effort."  (AR 297.)  Plaintiff reported that he was depressed, anxious, and hearing voices.  (AR 298.)  He denied any past psychiatric hospitalizations or homicidal ideation. (Id.)  He reported that he was attending 12-step meetings and that he was able to take public transportation, manage self-care, and handle his own funds.  (AR 299.)  Dr. Krieg stated that "[Plaintiff] was oriented to time, place, and purpose of the visit"; "[Plaintiff] spoke with a normal rate of speech that was clear and easy to understand"; "verbal response times were normal"; "[h]e was able to understand test questions and follow directions"; and "[he] presented with reserved mood and constricted affect."  (Id.)  He scored in the severe deficit range on Trails A and B, which tested Plaintiff's attention and concentration with visual-scan and divided-attention tasks.  (AR 300.)  "[He] reported not being able to see Trail test items." (Id.)  He also scored "in the extremely low range on WAIS-III Working Memory Subtests[] and in the moderate mental retarded range on WMS-III Working Memory Subtests."  (AR 299.)  Dr. Krieg noted, however, that "[Plaintiff] may not have been putting forth his best effort on al [sic] tasks; therefore, the test results may not be valid."  (AR 300.)  Dr. Krieg explained:

> He reported not being able to see many of the test items. However, he performed . . . tasks that required verbal comprehension[,] and he still did poorly.  This raises the question of a conscious or unconscious effort to

1   feign impairment, i.e., fake bad. . . . [I]t is
2   conceivable that his performance could be higher.

3       If his test performance is not a valid indicator of
4   his current level of functioning, he would be capable of
5   understanding clear instructions, following simple
6   directions, and completing tasks. He would be able to
7   sustain performance on detailed and complex tasks. He
8   would be able to accept instructions from supervisors and
9   interact with coworkers and the public. He would be able
10      to maintain regular attendance in the workplace.
11  (AR 301-02.) Dr. Krieg opined that if his test results were
12  invalid and "he [were] not abusing substances, there is no
13  impairment that would interfere with his ability to complete a
14  normal workday or workweek." (AR 302.)

15      On January 16, 2009, Dr. C. Eskander evaluated Dr. Paikal's
16  ophthalmologic records. (AR 320.) He found that "current CE
17  eyes exam findings do not support VA alleged by [Plaintiff]" and
18  noted that Plaintiff's daily activities of attending group
19  meetings, doing laundry, mopping floors, going outside alone,
20  watching television, and using glasses prescribed in 2008 were
21  inconsistent with blindness or severe vision limitations. (Id.)

22      On January 26, 2009, Dr. E. Harrison examined the then-
23  available psychiatric evidence of record. (AR 303-314.) He
24  opined that Plaintiff's psychological and substance-abuse
25  disorders caused "mild" restriction of daily activities, "mild"
26  difficulties maintaining social functioning, and "moderate"
27  difficulties maintaining concentration, persistence, or pace, but
28  there was insufficient evidence to suggest repeated episodes of

14

1  decompensation.  (AR 311.)  Dr. Harrison noted, "He [was] not

2  credible at [consultative examiner Krieg's examination]; effort

3  not great, test scores not consistent with presentation or

4  treatment records or [activities of daily living], date last used

5  meth, and frequency, conflicts with [parole outpatient clinic]

6  records."  (AR 313.)  Dr. Harrison adopted the ALJ's January 2005

7  decision and completed a mental-RFC assessment, stating that

8  Plaintiff was "not significantly limited" except for "moderate"

9  limitations in his ability to understand, remember, and carry out

10  detailed instructions.  (AR 313, 315-17.)

11  On January 26, 2009, disability examiner C. Stevenson

12  examined the available medical and psychological evidence of

13  record and completed a "Chavez Rationale."[9]  (AR 76.)  Stevenson

14  indicated that there had been no material change in the evidence

15  related to Plaintiff's RFC findings, age, education, past work,

16  or transferrable skills since the ALJ's January 2005 decision,

17  and the relevant medical-vocational rules had not changed.  (AR

18  76.)

19

20  [9]  Plaintiff's unfavorable January 2005 decision created a
presumption of continuing nondisability that could be rebutted

21  only if Plaintiff showed a "changed circumstance" affecting
disability.  Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3

22  (Dec. 3, 1997).  A "Chavez Rationale" addresses whether material
changes have occurred that might rebut this presumption.  See

23  Garrett v. Astrue, No. 1:08cv01626 DLB, 2010 WL 546724, at *9
(E.D. Cal. Feb. 10, 2010) (citing Chavez, 844 F.2d at 694).

24  Notwithstanding Stevenson's "Chavez Rationale," Plaintiff alleged
new impairments of depression and anxiety (AR 211), thereby

25  rebutting the presumption of continuing nondisability.  See
Lester, 81 F.3d at 827 ("[The ALJ] may not apply res judicata

26  where the claimant raises a new issue, such as the existence of
an impairment not considered in the previous application.")

27  (citation omitted).  The ALJ did not refer to the prior ALJ
decision in his decision.

28

15

1    On February 9, 2009, Dr. Inderjit and Ms. George met with
2    Plaintiff.  (AR 347.)  Ms. George noted that Plaintiff reported
3    "be[ing] clean 'a couple months.'"  (Id.)  Dr. Inderjit noted
4    Plaintiff's statements that he "h[ad] nothing to live for" but
5    that he was not suicidal; Plaintiff reported hearing voices but
6    was "[alert and oriented] x 3," clean, and cooperative, with fair
7    eye contact, insight, judgment, and impulse control.  (Id.)  He
8    exhibited spontaneous speech and an euthymic mood.  (Id.)  Dr.
9    Inderjit increased his dosages of Remeron and Risperdal and
10   advised him to "call 911" if suicidal ideation returned.  (Id.)

11   On April 13, 2009, Plaintiff again met with Dr. Inderjit and
12   Ms. George.  (AR 346-47.)  Ms. George noted that Plaintiff was
13   anxious and nervous but had no suicidal ideation.  (AR 347.)  Dr.
14   Inderjit, however, noted that suicidal thoughts had "cross[ed]
15   [Plaintiff's] mind."  (Id.)  Dr. Inderjit again increased
16   Plaintiff's Risperdal dosage and added Benadryl to his regimen.
17   (Id.)

18   On May 1, 2009, psychiatrist Dr. Mark Jaffe examined
19   Plaintiff.  (AR 346.)  He noted that Plaintiff was calm and
20   cooperative, with no suicidal or homicidal ideation.  (Id.)  He
21   stated that Plaintiff was depressed and hearing voices but had
22   never been hospitalized for psychiatric problems.  (Id.)

23   On May 22, 2009, Dr. H. Crowhurst, a surgeon, performed a
24   case analysis in which he concurred with Dr. Eskander's January
25   16, 2009 opinion concerning Plaintiff's vision.  (AR 322-24.)
26   Dr. Crowhurst noted, "I have reviewed all the evidence in file
27   and the physical assessment (IE to adopt ALJ findings)[] of
28   01/16/09 is affirmed as written."  (AR 324.)  He also observed

16

1   that Plaintiff exhibited "poor effort" during the consultative

2   examinations.  (<u>Id.</u>)

3       On May 27, 2009, psychologist Dr. P. Davis reviewed

4   Plaintiff's psychological evidence of record and noted his

5   agreement with Dr. Harrison's opinion that the January 2005 ALJ

6   opinion should be adopted.  (<u>Id.</u>)

7       On June 24, 2009, Plaintiff met with both Dr. Jaffe and Ms.

8   Gupta.  (AR 345.)  Ms. Gupta reported that he was upset that his

9   SSI claim had recently been denied but that he was "doing fine."

10  (<u>Id.</u>)  Ms. Gupta noted that he "denie[d] symptoms of

11  depression[,]" and his medication "appear[ed] to be helping."

12  (<u>Id.</u>)  Dr. Jaffe, however, noted that Plaintiff complained of

13  insomnia and depression and was still hearing voices.  (<u>Id.</u>)

14      On August 20, 2009, Ms. Gupta again met with Plaintiff.  (AR

15  344.)  She noted that he was unhappy and nervous but that he had

16  been looking for a part-time job.  (<u>Id.</u>)  He reported taking his

17  medications regularly and denied any suicidal or homicidal

18  ideation.  (<u>Id.</u>)  He complained that "he [was] more forgetful and

19  confused" than in the past.  (<u>Id.</u>)

20      On September 22, 2009, Dr. Garrett M. Halweg, a

21  psychiatrist, examined and evaluated Plaintiff.  (AR 336-37, 342-

22  43.)  Dr. Halweg noted that Plaintiff was well groomed,

23  cooperative, alert, able to fully concentrate, and fully

24  oriented; his memory was "grossly intact for immediate, recent,

25  and remote events."  (AR 343.)  He spoke normally and exhibited a

26  euthymic and appropriate affect.  (<u>Id.</u>)  He showed fair impulse

27  control, insight, judgment, and reliability.  (<u>Id.</u>)  Dr. Halweg

28  diagnosed Plaintiff with amphetamine dependence and

schizoaffective disorder.  (Id.)  That same day, Plaintiff met with Ms. Gupta, who noted that Plaintiff complained of boredom, stress, and having "nothing to do and no money, only TV is the high light [sic] of the day."  (Id.)  Plaintiff also stated that he had "constant thoughts of hurting [himself] and others," although he had no plan to do so.  (Id.)

On September 28, 2009, Ms. Gupta met with Plaintiff and noted that he was "doing fine, sometimes gets nervous and anxious[,]" but "[s]leep[ing] well with medication."  (AR 342.)

Over the following months, Plaintiff stopped going to his appointments with Dr. Halweg and Ms. Gupta.  (AR 341-42.)  He missed appointments with Ms. Gupta on October 26 and December 7, 2009, as well as on January 19, 2010, and he missed an appointment with Dr. Halweg on December 7, 2009.  (Id.)  During this period, however, on November 2, 2009, Ms. Gupta completed a four-page "mental impairment questionnaire" that described her impressions of Plaintiff's impairments.  (AR 331-34.)  Ms. Gupta noted that she had met with Plaintiff two to three times a month since October 2008.  (AR 331.)  She checked boxes indicating that Plaintiff exhibited "decreased energy"; "thoughts of suicide"; "intense and unstable interpersonal relationships and impulsive and damaging behavior"; "blunt, flat or inappropriate affect"; "poverty of content of speech"; "generalized persistent anxiety"; "difficulty thinking or concentrating"; "flight of ideas"; "easy distractibility"; "memory impairment"; "paranoid thinking or inappropriate suspiciousness"; "hallucinations"; and "disorientation to time and place."  (AR 332.)  She found that Plaintiff did not have a low IQ or reduced intellectual

18

functioning but indicated that he suffered "moderate" restriction
of activities of daily living; "marked" difficulties in social
functioning; and "extreme" deficiencies of concentration,
persistence, or pace.  (AR 333.)  She also marked down that
Plaintiff had suffered "four or more" episodes of decompensation
within a 12-month period, with each episode lasting two weeks or
more.  (Id.)

           3.   Analysis

In his November 2010 decision, the ALJ found Plaintiff only
partially credible, explaining that "[Plaintiff's] statements
concerning the intensity, persistence and limiting effects of
[his] symptoms" were not credible.  (AR 36.)  Plaintiff has not
challenged the ALJ's credibility finding.  The ALJ gave Ms.
Gupta's November 2, 2009 mental-impairment questionnaire "little,
if any, weight" because it was "generally unsupported by the
medical evidence," but he gave "significant weight" to Dr.
Krieg's January 13, 2009 consultative examination and Dr.
Harrison's January 26, 2009 state-agency consultation.  (AR 37-
38.)

Plaintiff argues that the ALJ did not set forth sufficient
reasons for rejecting Ms. Gupta's opinions as set forth in her
November 2, 2009 mental-impairment questionnaire.  (J. Stip. at
4.)  This argument is unavailing because Ms. Gupta, an LCSW, was
not an acceptable medical source under 20 C.F.R. § 416.913.
Thus, her opinions were not entitled to special weight.
Moreover, even if Ms. Gupta were an acceptable source, her
mental-impairment questionnaire was a conclusory, brief check-off
report that the ALJ was entitled to disregard; in any event, the

1    ALJ provided specific and legitimate reasons for rejecting her
2    opinion.

3         Plaintiff relies on Gomez for the proposition that Ms.
4    Gupta's opinion should have been accorded the same weight as that
5    of a treating physician because "Ms. Gupta worked in conjunction
6    with Dr. Halweg, the treating psychiatrist." (J. Stip. at 10.)
7    This argument is incorrect.  In Gomez, the court held that a
8    nurse practitioner's opinion was properly considered "as part of
9    the opinion of [the plaintiff's treating physician]" because she
10   "worked closely under [his] supervision" and "was acting as [his]
11   agent."  Gomez, 74 F.3d at 971.  The subsection of the regulation
12   that was the basis for the court's decision in Gomez has since
13   been deleted by amendment, however.  See 65 Fed. Reg. 34,950,
14   34,952 (June 1, 2000).  Thus, under the current regulations, a
15   social worker like Ms. Gupta qualifies only as an other source,
16   irrespective of her relationship to an acceptable medical source.
17   20 C.F.R. § 416.913(d); see Hudson, 2012 WL 5328786, at *4 n.4
18   ("Interdisciplinary team" no longer listed under the definition
19   of acceptable medical sources); Farnacio v. Astrue, No. 11-CV-
20   065-JPH, 2012 WL 4045216, at *6 (E.D. Wash. Sept. 12, 2012)
21   ("There is no provision for a physician assistant to become an
22   acceptable medical source when supervised by a physician or as
23   part of an interdisciplinary team.").  In any event, there is no
24   evidence here to suggest that Ms. Gupta was working under Dr.
25   Halweg's close supervision or on his behalf.  Neither Ms. Gupta's
26   nor Dr. Halweg's medical notes evidence any consultation or
27   interaction between them.  Although Dr. Halweg's examination of
28   Plaintiff apparently took place on September 22, 2009, the same

date as one of Ms. Gupta's examinations (AR 342-43), Plaintiff
met with both Dr. Jaffe and Ms. Gupta on June 24, 2009, and none
of the evidence of record suggests that Ms. Gupta was also
working under Dr. Jaffe's supervision or acting as his agent, and
Plaintiff does not so contend.  For all these reasons, Ms.
Gupta's opinion was not entitled to special weight because she
was merely an other source.  See 20 C.F.R. § 416.913(d)(1)
(medical sources such as therapists who do not qualify as
acceptable medical sources are other sources); see also Gomez, 74
F.3d at 970-71 (ALJ may accord opinions of other sources less
weight than those of acceptable medical sources).

Even if Ms. Gupta did qualify as an acceptable medical
source, however, the ALJ did not err because Ms. Gupta's opinions
were conclusory, brief, and generally unsupported by the medical
evidence.  Moreover, the ALJ provided specific and legitimate
reasons for rejecting her opinions, noting that Ms. Gupta's
questionnaire was inconsistent with (1) Dr. Inderjit's December
8, 2008 mental-status examination, (2) Dr. Krieg's January 13,
2009 consultative examination, (3) Dr. Halweg's September 22,
2009 mental-status examination, and (4) Dr. Harrison's January
29, 2009 consultative opinion.  (AR 36-38.)  The ALJ noted that
Ms. Gupta was not Plaintiff's "sole doctor or medical personnel"
from October 2008 to November 2009 and based his opinion on
evidence from other treatment visits that occurred during this
period.  (AR 37.)  He further noted that Ms. Gupta's
questionnaire did not indicate whether the purported limitations
contained therein applied to the entire period that Ms. Gupta
treated Plaintiff.  (Id.)  Indeed, Ms. Gupta left blank the

1  question asking for the earliest date the symptoms and
2  limitations began.  (AR 334.)

3      The ALJ was entitled to reject Ms. Gupta's November 2, 2009
4  questionnaire because it was a check-off report that did not
5  contain explanations of the bases for its conclusions.  See Crane
6  v. Shalala, 76 F.3d 251, 253 (9th Cir. 1996).  Ms. Gupta merely
7  checked the corresponding boxes in the questionnaire to indicate
8  that Plaintiff had various conditions.  (AR 332.)  She also
9  merely checked the relevant questionnaire boxes to indicate that
10 Plaintiff exhibited moderate restriction of activities of daily
11 living, marked difficulties in maintaining social functioning,
12 and extreme deficiencies of concentration, persistence, or pace,
13 with four or more episodes of decompensation within a 12-month
14 period.  (AR 333.)  The questionnaire did not provide Ms. Gupta
15 any opportunity to elaborate on the bases underlying these
16 findings, and Ms. Gupta did not answer all of the relevant
17 questions on the form.  Because Ms. Gupta's November 2009
18 questionnaire was an incomplete, brief, and conclusory check-off
19 form, the ALJ was entitled to disregard it.

20     Even if Ms. Gupta's questionnaire could not be disregarded
21 solely for being a check-off form, the ALJ articulated legally
22 sufficient reasons for disregarding it.  The ALJ was entitled to
23 credit Drs. Inderjit's, Krieg's, Halweg's, and Harrison's
24 opinions over Ms. Gupta's because those doctors' opinions were
25 based upon independent clinical findings and were thus
26 substantial evidence upon which the ALJ could properly rely.  See
27 Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001)
28 (explaining that a nontreating physician's contrary opinion "may

1  constitute substantial evidence when it is consistent with other
2  independent evidence of record").

3      First, the ALJ noted that Ms. Gupta's November 2009
4  questionnaire was not consistent with Dr. Inderjit's December
5  2009 examination.  Dr. Inderjit stated that Plaintiff denied any
6  suicidal ideation and was alert, oriented, and cooperative.  (AR
7  287.)  Plaintiff also exhibited fair eye contact, spontaneous
8  speech, euthymic mood, and appropriate affect.  (Id.)  These
9  findings conflict directly with Ms. Gupta's opinion that
10  Plaintiff exhibited thoughts of suicide; blunt, flat or
11  inappropriate affect; and disorientation to time and place.  (AR
12  332.)  Because Dr. Inderjit was a treating psychiatrist, his
13  opinion was entitled to controlling weight.  See 20 C.F.R.
14  § 416.927(c)(2); Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.
15  1989).

16      Second, Ms. Gupta's questionnaire was not consistent with
17  Dr. Krieg's January 13, 2009 consultative examination.  Dr. Krieg
18  performed a complete psychological evaluation of Plaintiff (AR
19  297) and found that "[Plaintiff] was oriented to time, place, and
20  purpose of the visit" and "was able to understand test questions
21  and follow directions."  (AR 299.)  Dr. Krieg noted that "[h]e
22  reported getting along with family and friends" (AR 301) and
23  "denied being currently suicidal" (AR 298).  Dr. Krieg also noted
24  that "[Plaintiff] was moderately to minimally cooperative and may
25  not have been putting forth his best effort," and she stated that
26  "[i]f his test performance is not a valid indicator of his
27  current level of functioning, he would be capable of
28  understanding clear instructions, following simple directions,

23

and completing tasks." (AR 302.)  She continued, "He would be able to maintain a regular attendance in the workplace." (Id.) Dr. Krieg's examination report conflicts with Ms. Gupta's opinion that Plaintiff exhibited thoughts of suicide, intense and unstable interpersonal relationships, disorientation to time and place, and easy distractibility. (AR 332.)  Moreover, Ms. Gupta's opinion that Plaintiff exhibited marked difficulties in maintaining social functioning, extreme deficiencies of concentration, persistence, or pace, and four or more repeated episodes of decompensation within a 12-month period was inconsistent with Dr. Krieg's opinion that if Plaintiff's test results were invalid because of malingering, he would be able to maintain continual attendance in the workplace (AR 57-58)[10] and Dr. Harrison's finding that there was insufficient evidence of any episodes of decompensation (AR 311).  Indeed, as the ALJ noted, nowhere in the record is there any evidence of psychiatric hospitalizations or other "breakdowns." (AR 36.)

Third, Ms. Gupta's questionnaire was inconsistent with Dr. Halweg's mental-status examination, performed on September 22, 2009, roughly one week before Ms. Gupta's questionnaire was completed.  Dr. Halweg noted that Plaintiff was "alert, able to

---

[10]    Plaintiff argues that Dr. Krieg's opinion did not constitute substantial evidence "because she reviewed no medical records."  Indeed, on the face of the record, it appears that Dr. Krieg reviewed only Plaintiff's adult-disability report form. (AR 297.)  The ALJ did not err, however, in according Dr. Krieg's opinion significant weight because it was based on her own clinical findings.  See (AR 297, 302); Thomas, 278 F.3d at 957 ("[O]pinions of non-treating or non-examining physicians may . . . serve as substantial evidence when . . . consistent with independent clinical findings or other evidence in the record.").

fully attend and concentrate[,]" and not suicidal.  (AR 343.)  He
was "fully oriented to person, place, date and circumstances,"
with memory "grossly intact for immediate, recent, and remote
events."  (Id.)  He exhibited a euthymic, appropriate affect and
fair impulse control, judgment, insight, and reliability.  (Id.)
These findings contradicted Ms. Gupta's opinion that Plaintiff
exhibited suicidal ideation, disorientation to time and place,
flight of ideas, impaired memory, and inappropriate affect.  (AR
332.)  Because Dr. Halweg was a treating psychiatrist, his
opinion was entitled to controlling weight.  See 20 C.F.R.
§ 416.927(c)(2); Magallanes, 881 F.2d at 751.  Moreover, even if
Ms. Gupta was working with Dr. Halweg, to the extent their
opinions conflicted his would presumably control because he was
an actual doctor.  Cf. Gomez, 74 F.3d at 971 (doctor and nurse
practitioner working with him shared same opinion); Farnacio,
2012 WL 4045216, at *6 (Gomez inapplicable when doctor and aide
have differing opinions).

        Fourth, Ms. Gupta's questionnaire was inconsistent with Dr.
Harrison's January 26, 2009 opinion, which was based on his
review of Plaintiff's psychological records.  Dr. Harrison opined
that Plaintiff exhibited only mild restrictions of activities of
daily living, mild difficulties in maintaining social
functioning, and moderate difficulties in maintaining
concentration, persistence, or pace.  (AR 311.)

        Plaintiff argues that because Dr. Harrison reviewed only the
psychiatric records available as of January 26, 2009, his opinion
"cannot be substantial evidence to support the ALJ's decision."
(J. Stip. at 5.)  Plaintiff does not, however, cite any case law

to support this contention or articulate any standard for
determining how recent the reviewed psychiatric records must be
for a reviewing physician's opinion to constitute substantial
evidence.  Nor does he point to any aspect of his condition that
changed after January 2009.  In any event, to the extent
Plaintiff claims that the ALJ erred in rejecting Ms. Gupta's
opinion in favor of Dr. Harrison's because he was only a
reviewing physician, no error occurred.  Because Ms. Gupta was
not an acceptable medical source, the ALJ did not need to rely on
substantial evidence to reject her opinion - Dr. Harrison's
opinion alone was sufficient.  Cf. Lester, 81 F.3d at 831
(nonexamining physician's opinion cannot by itself be substantial
evidence to justify rejection of an examining or treating
physician's opinion).

     The ALJ was also entitled to reject Ms. Gupta's opinion to
the extent it was based on Plaintiff's subjective complaints, the
rejection of which Plaintiff does not challenge.  See (J. Stip.
at 9); Tonapetyan, 242 F.3d at 1149 (when ALJ properly discounted
claimant's credibility, he was "free to disregard" doctor's
opinion that was premised on claimant's subjective complaints).

     Plaintiff further argues that the ALJ erred in not
contacting Ms. Gupta to ask her the time frame to which her
mental-impairment questionnaire applied.  This argument is
unavailing.  The ALJ had no duty to contact Ms. Gupta because the
record was sufficiently unambiguous and complete to allow for
proper evaluation of the evidence.  See Brinegar, 337 F. App'x at
712 (ALJ's duty to "re-contact" a treating physician only
triggered when that physician's evidence inadequate to allow the

ALJ to determine disability).  The medical evidence of record, including Drs. Harrison's, Inderjit's, Krieg's, and Halweg's opinions, provided a complete picture of Plaintiff's level of functioning, and remand is unwarranted.

**VII. CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[11] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: August 2, 2013

_JEAN ROSENBLUTH_
JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[11]   This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."